UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-10164-GAO |
| | ) | |
| GUILLERMO FREDERICO VASCO | ) | |

**UNITED STATES' OPPOSITION TO
DEFENDANT'S MOTIONS FOR
JUDGMENT NOTWITHSTANDING THE VERDICT
AND FOR A NEW TRIAL**

The United States of America respectfully requests this Court to deny the defendant's motions for judgment notwithstanding the verdict and for a new trial. The defendant makes essentially the same claims in support of both motions, that is: (1) the evidence was insufficient for the jury to conclude that he used the mail and the telephone with the intent that his wife and daughter be murdered or that any money was paid or promised to be paid to do so;  (2) there was no proof that murder violates Massachusetts law and the jury should not have been told that it does;  and (3) the defendant was entrapped into using the mail and the telephone and the Court should have given an entrapment instruction.   All of these claims are meritless.

**THE EVIDENCE**

The defendant was convicted after a six-day jury trial. Dr. Tricia Vasco testified that her five-year marriage to the defendant had deteriorated and that in mid-March 2004, at her request, the defendant moved out of the home they shared with her parents at 14 Ruth Avenue, in Peabody, Massachusetts. Although she initially thought they might ultimately reconcile, she had concluded by the beginning of May 2004 that this would not happen and had told him so.   She

1

testified that when the defendant showed up at the door at about 9:30 a.m. on May 5th, she was surprised, because he did not have a scheduled visit with the baby that day. He was dressed in a suit, smiling and appeared to be happy. She let him in and he told her he had been accepted to two law schools, one in Springfield, Massachusetts, and one in Florida, and that this was good news because it meant they could get back together. Dr. Vasco responded that this was not going to happen; that their problems were never about his career; and she urged him to make his decision without factoring her into the equation. This conversation lasted about 20 minutes and when it ended, Dr. Vasco was seated in a rocking chair in the living room, holding 3-month old Claudia on her chest.

    Dr. Vasco testified that the defendant then pulled out a strip of duct tape--about 10 inches long--and put it on her mouth and at that time she saw he also had a knife. Dr. Vasco said she leapt up, and started screaming. The defendant took the baby from her and put her on the floor and yelled at TriciaVasco to shut up. She lunged for the phone, but the defendant reached it first, took the batteries out and threw them across the room. Dr. Vasco testified that she was either pushed, or fell, but she ended up on the floor and the defendant struck her on the back of the head with his fists all the while yelling at her to shut up. Grabbing her around the neck with a choke hold, he pulled her first to the couch, where he wrapped more duct tape around her mouth and head, and then --grabbing the baby-- he forced her downstairs to the basement apartment they had shared.

    The defendant brought her directly to the bedroom, where he bound Dr. Vasco's left hand to the bedpost with duct tape. He also placed the baby on the bed, toward Tricia Vasco's feet, but out of her reach. She testified that the defendant demanded to know where her wedding ring

was and when she was able to mumble through the duct tape that it was in the bathroom, he retrieved it and placed it on her bound left hand. She testified that he also brought in a gas can and threatened to burn the house down so they "would all go to heaven together;" that he boasted about how sharp the knife was, waving it around and cutting her, and further demonstrating its sharpness by stabbing the mattress; and that he raged--blaming everyone else for their problems--and cried. Dr. Vasco testified that she saw a potential way out for her and the baby. She said she began telling the defendant that she would do anything; that she did love him; that they could go away together; and entreated him to consider his daughter. She said she told the defendant these things because she wanted to calm him and she wanted to get out of the house. The defendant did calm down. Dr. Vasco said he wanted to have sex and although she tried to convince him to wait until they reached their destination, she did not resist when he insisted. She was still bound to the bed. The defendant then cut the duct tape from her wrist and hair and they packed up some things to take to Canada. Dr. Vasco testified that she could not find her passport and convinced the defendant that they should get her birth certificate at Lynn City Hall. While there, Dr. Vasco waited until a male janitor came into the clerk's office and then she ran behind the counter, with the baby, and screamed that they were being kidnapped. The defendant fled. He was ultimately arrested and jailed.

      The jury then heard from ATF Special Agent Mike Curran who testified that in approximately March 2005 he received information from Kevin Perry, an inmate at ECCF where Vasco was incarcerated, and with whom Curran had worked in other investigations. Curran, who worked in the Worcester Field Office, passed along the information to the ATF Boston Field Office because, as a result of the information, Vasco had been identified as a target of a

new investigation. ECCF is within the Boston Field Office's territory. Perry, called by the defense, also testified and said that he had become friendly with Vasco. Perry said Vasco approached him and asked him for assistance in finding someone to kill his wife and daughter. Perry said he immediately alerted ATF Agent Curran.

ATF developed an investigative plan. The plan called for Perry to introduce Vasco to ATF Special Agent Kenneth Croke, posing as a hit man friend of Perry's named "Mike." Pursuant to the plan, Perry was to first tell Vasco about the hit man, that the hit man lived in Portland, Maine, and that Vasco should send a letter to the hit man's post office box describing what he wanted done to his wife and daughter. This post office box was in fact the address of an ATF undercover post office box.

In late March 2005, Special Agent Curran communicated those instructions to Perry. A few days later, Curran received a letter from Perry which contained a note in Perry's handwriting, as well as several other pages of handwritten notes containing detailed information about Tricia Vasco and her family members and friends, as well as hand-drawn maps of the basement and first-floor of her house and photographs of its exterior. [Ex. 1]. Dr. Vasco testified that the information on these notes was accurate, that the diagram accurately depicted the layout of the home she had shared with Vasco, and that the writing on these notes appeared to be Vasco's.

The note from Perry in this letter revealed the code that Vasco would use in speaking about the prospective murder of Vasco's wife. Tricia Vasco, his wife, would be referred to as a dog named "Nickie" and her daughter was to be referred to as Nickie's puppy named "Candy."

On April 7, 2005, ATF received a letter from Vasco at the undercover post office box in

Portland. [Ex. 4]. In it, Vasco stated:

> I've heard that our friends and their doggy Nickie will take a trip down there, Ah? That would be great if you could help them. But Nickie is very old and sick. She won't survive such trip ... the only thing would be to put Nickie to sleep ... I knwow (sic) . . . Sad but true . . . Like our favorite Metallica song . . . Ja . .? She was soo (sic) loyal and obidient (sic). Anyways if so can she be buried outside of Mass. . ? Making sure that Nickie will be 10 feet down and do not forget the cement thing. Also I'd like to know if Candy would be able to see the family if not she must stay with Nickie down there . . .

Later, the letter goes on to say:"I wish there is a better choice. Will be much more nickie's...i promes ya...ok? In the other hand I'll send ya the money collection that I mentioned. Remember that it's value more than five thousand dollars."

On April 26, 2005, ATF Special Agent Croke, posing as the hit man, met with Vasco at the ECCF in Middleton where Vasco was in custody. Special Agent Croke was wearing concealed recording devices to capture both audio and video and met with Vasco in an inmate/attorney meeting room, as Vasco had been led to believe that Croke would pose as a lawyer to jail officials. [Exs. 9&10]. In the meeting, Vasco pulled out a copy of the Nickie letter, and read portions of it aloud. When Croke asked who Nickie is, Vasco said, "my wife." He also repeatedly confirmed that he wanted her body buried outside of Massachusetts "because I don't want, in the future, somebody can find her." He also confirmed that the cement was important and admonished Croke to "just make sure the body...be more than 10-feet down."

The defendant provided photos of Tricia Vasco to the undercover agent, [Exs. 11 & 12], and he also displayed pictures of his daughter and said, "This is the puppy." At this, and in subsequent conversations, the defendant said that the "puppy" should go to Canada, and from there to his mother in Ecuador. Croke also showed Vasco photographs of Tricia Vasco's house

and car, [Exs. 13-16], and said he had been surveilling the premises. Vasco looked at the pictures and described for Croke how best to get into the house. Vasco said he did not want anything done to his in-laws.

In this first meeting, the agent described another method of disposing of a body which would cause it to ultimately disappear. He said that the body could be put into an oil drum, which would be drilled with holes and filled with cement, and then dropped into the ocean. In that way, Croke said, the body would eventually be eaten. Vasco responded, "I think I like that idea" and added that he thought that was the "best way." Vasco also directed Croke to make the car disappear. Croke said he was going to make it look like Tricia Vasco had disappeared as well. Vasco responded "OK, because she's --she's supposedly going to court June 18th to testify against me." Croke's response: "Ah, so she goes away, your case goes away."

Vasco agreed to pay for the hit man's efforts in periodic installments, once he had been released from jail and had returned to Ecuador, in addition to providing an international money collection he owned that he now said was worth $10,000. Vasco said that his lawyer had the money collection and Vasco and Croke agreed that someone would pick it up from Vasco's lawyer as partial payment.

On April 28, 2005, Special Agent Croke, again posing as the hit man, spoke on the telephone to Vasco and the conversation was recorded. [Ex. 17]. In the call, Agent Croke said that Perry had mentioned that Vasco had some concerns about going forward and Croke told Vasco that if he did not want to go through with it, that would be fine because Croke had not put a lot of time into "the proposal." Vasco responded: "No-no-no--no, no, actually, I, I really thank you for the time and the effort...just go ahead, oh, absolutely, green light. I need the

documentation, I need the ...I need the stuff done. " The concern that Vasco had expressed was actually about Croke's choice of clothing in their first meeting. Vasco said: "Yeah, I was kind of concerned about the, eh, about the, eh, about the color of your jacket." He urged Croke to "wear the dark suit that Uncle, Uncle, Uncle Jerry gave it to you." Croke promised that at the next meeting, he would wear his "Sunday best." In this call, Croke and Vasco also further refined the arrangements to pick up the money collection from Vasco's lawyer.

ATF Special Agent Stephanie Schafer, acting in an undercover capacity as a friend of the "hit man's" named "Stephany Bears," testified that on April 29, 2005, she met with Vasco's attorney, Fred McAlary, at the attorney's law office. Schafer obtained an envelope filled with 59 different paper currencies from assorted countries and two cardboard sheets with assorted coins from different countries taped to the cardboard. [Exs. 25 & 26]. Attorney McAlary, testifying for the defense, said he turned over the money to "Stephany" and that he did so at Vasco's direction.

After picking up the money collection, on April 29, 2005, Croke spoke on the phone with Vasco again and berated Vasco about the money collection. [Ex. 18]. He said that it was "a little light," meaning that the collection would not be sufficient to pay for the murder, and that he needed some cash to cover operating expenses. As Croke said, "The supplies to get the project going cost money." Vasco said his attorney had $400 of his money, which he would have his attorney give to "Stephany." In the same conversation, Vasco told Croke that "working in the, in the basement of the house will be kind of difficult, ah, so---maybe have them working outside" which Croke understood to be a direction that the "murder" occur outside of the house. Croke told Vasco that that's what he planned to do.

On May 3, 2005, Special Agent Schafer, again posing as "Stephany Beards," returned to Vasco's attorney's office and was given a check payable to "Stephany Bears" in the amount of $200. [Ex. 28].   In making arrangements to meet again, Schafer's telephone call to McAlary was recorded. [Ex. 27].   In this conversation, the attorney said he had spent some time with Vasco and that he would be giving her the money at Vasco's direction.  McAlary also testified that he wrote the check to give to Schafer at Vasco's direction.

The jury also heard testimony from Tricia Vasco and ATF Special Agents Croke and Matthew O'Shaughnessy that the agents met with Tricia Vasco on May 10, 2005, and told her about the investigation.  She was asked to --and agreed to --help the ATF by posing for photographs of her supposed murder by the hit man.  A makeup artist made her up so that it appeared as if she had been beaten and shot in the head with a small caliber handgun.  She then posed lying on the ground, still and unmoving, with eyes closed, in a wooded area adjacent to a body of water and next to a fifty gallon oil drum. She was photographed. [Exs. 6-8].

On May 16, 2005, Special Agent Croke, posing as the hit man, had another recorded telephone call with Vasco. [Ex. 19].   Croke said that the project was in its very final stages and that it "should be completed very soon."  Vasco responded: "Oh, okay. That will be fantastic." Then Vasco asked "I would like to know if we have time to -- to present that, uh, motion to suppress evidence, ah, proposal to sink all of this and you know, very, very deep. " Agent Croke testified that he initially he did not understand what Vasco was talking about, but later realized it was a reference to sinking Vasco's wife's body deep in the ocean in the oil drum.  They planned to meet the next day and the defendant said "maybe I can give you some insight, some, some, you know, ideas that maybe that things that I –that you might do or not..." which Agent Croke

understood to mean that the defendant was going to give him some additional ideas about how best to murder Vasco's wife and kidnap his daughter.

On May 17, 2005, Special Agent Croke returned to the jail to meet with Vasco. Croke was again wearing concealed recording devices and the meeting was captured on video. [Exs. 20 & 21]. Before the two talked, Agent Croke testified that the defendant inspected the room, apparently for recording devices. In the meeting, Croke raised the issue of payment again, stating (without resort to code) that the cost of "getting rid of" Vasco's wife and kidnaping his daughter would be $20,000. Vasco offered to provide Croke with two false passports from Ecuador –one for Croke and one for "Stephany"–which they agreed would be worth $5,000. While continuing to discuss the arrangements, Vasco said, " I would like, you know, to take care of my business by my own hands, but... I'm here."

Vasco asked Croke if he still planned on using a barrel to dispose of his wife's body in the ocean. At that point, Croke told Vasco that the murder had been committed the day before and that Vasco's daughter was currently with "Stephany." Croke said that Vasco's wife had fought ferociously before the murder and was bigger and stronger than he had anticipated. He told Vasco that just before her death, he (Croke) told her that this was being done "for Guillermo." At this, Vasco smiled broadly.

Croke showed the defendant three of the photographs for which Tricia Vasco had posed. Vasco pointed at one and asked about the black hole on Vasco's wife's forehead. Croke explained that it was a .22 caliber bullet hole. When Vasco subsequently expressed concern that copies of the photographs might be found, Croke assured him that he had shredded the printer cartridge and the disk containing the photographs and would destroy all the copies. Vasco also

asked about his wife's cell phone and her clothing and Croke assured him that everything had been put in the oil drum and dumped into the ocean.

There also was lengthy discussion about the arrangements for "Stephany" to travel to Ecuador to deliver Vasco's daughter to his mother. Croke said that she would likely be delivered on the following Saturday or Sunday (i.e., May 21 or 22, 2005). Vasco said that his mother would meet his daughter at the airport in Quito and that she would be holding a sign reading, "Julia." He provided Croke with a photograph of his mother, gave him a note in Spanish and asked Croke to call his mother and read the note to her. [Exs. 22, 22A & 23]. The purpose of the note was to advise Vasco's mother of the daughter's probable arrival in Ecuador on May 22, 2005.

At the conclusion of the meeting, Croke told Vasco, "So this is a good day for you." "Everything is moving forward." Vasco replied, "Finally, the, final stage, and I really appreciate everything. It's a good job. I wish I could see that. I mean be there." When Croke then said, "I made sure she realized it was from you," Vasco said, "Thank you. I really appreciate that. And you've got, right now, my friendship, my loyalty, my respect. And anything you need, just come to me." Croke said "It's business" and the two shook hands.

Special Agent O'Shaughnessy and Essex County Sheriff's Investigator Jason Steiner also testified that they interviewed Vasco at ECCF on June 3, 2005, and asked him if he knew anything about the disappearance of his wife and daughter. Vasco said he did not. Special Agent Croke then entered the interview room, displaying his ATF badge, and told Vasco that he was not a hit man and that Vasco's wife had not been killed. Vasco began to cry and then to repeatedly ask "What about the other people?" and "Why are you doing this to me?"

Steiner also testified that a few days later Vasco was moved to another jail and that Steiner collected up Vasco's belongings from his ECCF cell which were contained in a large plastic box issued to each inmate. Steiner testified that he went through the materials in the box and found two items of evidentiary value. One was an envelope containing two slips of paper–one bearing the name and address of the "hit man" in Portland, Maine, and the other with Kevin Perry's address at the ECCF. [Ex. 3]. The other item Steiner identified was an envelope with a handwritten notation on the front "I Don't Want This That happen To me" which contained numerous newspaper clippings, including articles about Scott Peterson's trial for the murder of his wife, Laci, and Mark Hacking's entry of a not guilty plea on charges that he murdered his wife . [Ex. 29]. One of the Peterson clippings was dated October 26, 2004.

## ARGUMENT

**I.    THE EVIDENCE WAS SUFFICIENT FOR A RATIONAL JURY TO CONCLUDE THAT THE DEFENDANT USED THE MAIL AND THE TELEPHONE TO SOLICIT THE MURDER OF HIS WIFE AND DAUGHTER IN VIOLATION OF 18 U.S.C. § 1958.**

   **A.    Legal Standard for Judgment of Acquittal**

"[T]he standard of review for a judgment of acquittal notwithstanding the verdict is identical to the test employed to measure the sufficiency of the evidence supporting a guilty verdict. The test is whether, considering the evidence as a whole, taken in the light most favorable to the government, together with all legitimate inferences that can be drawn from such evidence, a rational trier of fact could have found guilt beyond a reasonable doubt." United States v. McNatt, 813 F.2d 499, 502 (1st Cir. 1987)(collecting cases.) Any issue of credibility must be resolved in favor of the jury's verdict. Id. (citing United States v. Winter, 663 F.2d

1120, 1127 (1st Cir. 1981)). Deference must be given to the verdict if the evidence supports different interpretations. Id. (citing United States v. Rivera-Sola, 713 F.2d 866, 869 (1st Cir. 1983)). "In other words, the prosecutor need only produce that quantum of evidence by which a reasonable trier of fact *could* find guilty beyond a reasonable doubt; there is no requirement to produce evidence that would *compel* a finding of guilt beyond a reasonable doubt." Id. (emphasis in original).

### B.    Legal Standard for New Trial

A new trial is a remedy that is to be "sparingly used" and only to avoid a "'miscarriage of justice.'" United States v. Rothrock, 806 F.2d 318, 322 (1st Cir. 1986)("a trial judge is not a thirteenth juror who may set aside a verdict merely because he would have reached a different result.") (citations omitted); United States v. Indelicato, 611 F.2d 376, 387 (1st Cir. 1979)(order of new trial proper only where there would be a "miscarriage of justice...and where 'the evidence preponderates heavily against the verdict.'")(quoting United States v. Leach, 427 f.2d 1107, 1111 (1st Cir. 1970)).  Where the claim is that a new trial is necessary because the verdict is against the weight of the evidence–rather than because some "prejudicial act" at trial resulted in an unfair trial, a district court's decision to grant a new trial will be subjected to more intense scrutiny. Payton v. Abbot Labs, 780 F.2d 147, 152 (1st Cir. 1985); Borras v. Sea-Land Service, Inc. 586 F.2d 881, 887 (1st Cir. 1978)(the trial court should not grant a new trial "'unless it is quite clear that the jury has reached a seriously erroneous result.'"  There is no error at all here, much less a "seriously erroneous result."

### C. A Rational Factfinder Could Conclude Beyond a Reasonable Doubt that the Defendant used the Mail and the Telephone with the Intent that his Wife and Daughter be Murdered.

The evidence was sufficient for a rational jury to conclude beyond a reasonable doubt that the defendant used the mail or the telephone with the intent that his wife and daughter be murdered. With respect to the daughter (Count Five), the evidence was the letter received by the ATF on April 7, 2005. In this letter–in which his daughter is referred to in code as "Candy," Vasco states:  Also I'd like to know if Candy would be able to see the family if not she must stay with Nickie down there . . ."  In the same letter, the defendant had previously described what was to be Nickie's fate–that is, she was to buried ten feet down and covered in cement. Thus, if "Candy" could not "see the family," a reference to her abduction and delivery to his family in Ecuador, then she must be killed as well.  Additionally, contrary to the defendant's contention in his motions,  there is indeed a promise to pay in the letter.  Vasco writes: "In the other hand I'll send ya the money collection that I mentioned. Remember that it's value more than five thousand dollars...." A rational jury could conclude beyond a reasonable doubt that the defendant wanted his daughter killed if she could not be kidnapped, and that he promised to provide a money collection valued at "more than five thousand dollars" in payment.  The government did not dispute that in the subsequent face-to-face meetings and telephone conversations with the undercover agent the defendant was focused on his daughter's kidnapping. The evidence was sufficient, however, for a rational jury to conclude that when the defendant mailed the letter received on April 7, 2005, he had the requisite intent.  As the Court properly instructed, conditional intent is sufficient. Holloway v. United States, 526 U.S. 1, 11 (1999)("cases and the scholarly writing...have recognized that the 'specific intent' to commit a

wrongful act may be conditional...'[a]n intent to kill, in the alternative, is nevertheless an intent to kill.'" (quoting R. Perkins & R. Boyce, Criminal Law, 647 (3d. Ed. 1982)); United States v. Anello, 765 F.2d 253, 262 (1st Cir. 1985) (conditional agreement to buy marijuana "if the quality was adequate," found sufficient for conspiracy as an agreement to buy); United States v. Arrellano, 812 F.2d 1209, 1212 n.2 (9th Cir. 1987) ("But conditional intent is still intent").

      As for the use of the mail and the telephone with the intent that his wife be murdered (Counts One through Four), the government submits that the evidence is overwhelming. The jury could determine based on the evidence it heard that it was the defendant's idea to have his wife killed, that he was the decision maker, and that he exerted control over the plan every step of the way. The defendant was jailed in May 2004 in connection with the attack on his wife and at least by October 2004, he was collecting newspaper clippings about wife killers. He was concerned even then with getting caught, as indicated by the notation on the front of the envelope containing the articles, that is "I Don't Want This That happen To me." By March 2005, his decision had been made, but he needed help to carry out the plan because he was in jail, although he would have preferred to, as he said, "take care of business by my own hands.[1]" He approached a fellow inmate, Perry, to see if he knew of a hit man for hire and then set about preparing the necessary information to accomplish the job. He drew a detailed diagram of each floor of the house which he had once shared with his estranged wife and he provided detailed information concerning his wife, her family and her friends. He mailed the letter received on April 7, 2005 (Count One) and in it directed that his wife be killed, buried, and covered with cement. As remuneration, he offered his "money collection," valued at $5,000. He then met

---

[1] The defendant made this statement in the May 17, 2005, meeting. [Ex. 21, Excerpt #1].

with and talked on the phone with Agent Croke to further refine the details of his scheme.  In the course of these meetings and conversations he provided Agent Croke with photographs of Tricia Vasco as well as guidance about the best method to get into the house and the best time to grab her to successfully complete the hit.

He also listened to the advice of someone whom he believed had some "expertise," that is the hit man.  Thus, although concerned that her remains might be discovered, he was initially adamant that the undercover agent should bury his wife's body outside of Massachusetts, 10 feet down, and covered in cement, he ultimately decided that the hit man's ocean disposal suggestion was the "best way."  Two days later, on April 28, 2005, when he was given the opportunity to reconsider his scheme, he spoke on the telephone to Agent Croke (Count Two) and, far from backing out, the defendant urged the agent to "just go ahead, , oh, absolutely green light."  In that call, the defendant and the undercover further refined the details about the payment and made arrangements for another agent to pick up the money collection from his lawyer, which occurred on April 28, 2005.  The defendant discussed the plan again in a telephone conversation on April 29, 2005 [Count Three] in which he agreed to pay an additional $400 (for supplies) because Agent Croke told him the "money collection" would not suffice.   In another telephone conversation, on May 16, 2005, (Count Four), the defendant told Agent Croke that he was glad he (Croke) was coming to visit the next day because he (Vasco)  might be able to give the hit man some  "ideas" of things he "might do" in carrying out the murder of Vasco's wife and abduction of his daughter.

At the May 17, 2005, meeting, before Agent Croke told Vasco that the murder had been completed, the two further discussed payment for the job.  In this meeting the defendant

acknowledged the cost of the job to be $20,000 and offered to provide Croke with two false passports from Ecuador. The two agreed that the passports would be worth $5,000.

Vasco did express concerns along the way, but these concerns related solely to detection. Vasco was afraid his wife's remains would be discovered and referred to Scott Peterson as an example of a situation he wished to avoid. He spoke in code on the telephone, referring to the hit man as Charlie and himself as Joe, questioned the hit man about his "motion to suppress evidence" which should "sink all of this... very very deep," and he also provided the "cover" that Special Agent Schafer should use with his attorney when she picked up the money. He instructed Agent Croke that his wife's car should "disappear," and was particularly concerned about whether Agent Croke had properly disposed of her cell phone and clothes. He questioned Agent Croke about the photos of the murder to make sure they were destroyed as well.

Thus, there was ample evidence from which the jury could conclude beyond a reasonable doubt that the defendant used the mail and the telephone with the intent that the murder of his wife be committed and that the murder was to be committed in exchange for the receipt of, or promise to pay, something of pecuniary value. Indeed, it is difficult to see how a rational jury could conclude otherwise.

## II. THE COURT PROPERLY INSTRUCTED THE JURY THAT MURDER IS AGAINST THE LAW IN MASSACHUSETTS.

The defendant argues that the government was required to prove that murder is against the law in the Commonwealth of Massachusetts and the Court erred by instructing the jury on this point. It is well-settled, however, that "[t]he law of any state of the Union, whether depending upon statutes or upon judicial opinions, is a matter of which the courts of the United

States are bound to take judicial notice, without plea or proof." Lamar v. Micou, 114 U.S. 218, 223 (1885); White v. Gittens, 121 F.3d 803, 805 n.1 (1st Cir. 1997).  The Court was correct to inform the jury of this fact.  See Mass. Gen. Laws ch. 265 §§ 1 and 2 (murder defined; punishment for murder.)

### III.  THE COURT PROPERLY DECLINED TO INSTRUCT THE JURY ON ENTRAPMENT.

At trial, the defendant urged the Court to instruct the jury on entrapment and argued that the defendant was induced into committing the crime by Perry and the government.  The government objected to the jury being so instructed because the defendant had not pointed to any evidence to support a claim that the government had induced the defendant to commit a crime he was not predisposed to commit.  United States v. Young, 78 F.3d 758, 760 (1st Cir. 1996)("The record must show 'hard evidence,' which if believed by a rational juror, 'would suffice to create a reasonable doubt as to whether government actors induced the defendant to commit a criminal act that he was not predisposed to commit.'")(quoting United States v. Rodriguez, 858 F.2d 809 (1st Cir. 1988)).  Inducement means "opportunity plus something else like excessive pressure, dogged persistence, or the government's taking advantage of an alternative non-criminal type of motive." United States v. Nishnianidze, 342 F.3d 6, 17 (1st Cir. 2003)(not improper inducement when FBI suggested questions for co-operating witnesses to ask defendant under investigation for extortion scheme, finding this to be "prime example of the government simply giving a suspect the opportunity to commit a crime.")  There was no pressure in this case, indeed, the defendant was given the opportunity to reconsider and he insisted that the murder proceed, giving it a "green light."

The defendant contends now, however, that the entrapment relates not to his desire to

have his wife and daughter murdered, but to his use of the mail and the telephone to solicit that crime. The defendant contends that the government "cause[d] the charged crime to be committed." [Def. Motion for New Trial at ¶2]. This argument is unavailing as well. The government's suggestion–acted on by the defendant–that he mail a letter and the defendant's voluntary participation in three telephone calls was not improper inducement that the defendant commit a crime he was not predisposed to commit. United States v. Podolsky, 798 F.2d 177, 180-81 (7th Cir. 1986)(government's conduct steering defendant to commit crime within federal jurisdiction not improper inducement); see also United States v. Woodward, 149 F.3d 46, 65 (1st Cir. 1998)(rejecting defendant's claim that prohibited mailing and wire acts were "a pretext to manufacture federal jurisdiction over a local offense," holding that "'Congress may protect the integrity of the interstate mails and wires by forbidding their use in furtherance of schemes to defraud a state and its citizens, whether or not it can forbid the scheme itself.'"); United States v. Wallace, 85 F.3d 1063, 1065 (2d Cir. 1996)(bank fraud conviction upheld even though federal jurisdiction based exclusively on federal agents pointing the defendant to direct his illegal activity against a federally insured bank); United States v. Clark, 62 F.3d 110, 114 (5th Cir. 1995)(conviction upheld where informant asked defendant to drive a stolen car across state lines for the sole purpose of establishing federal jurisdiction, noting that "the government had a legitimate interest in identifying and apprehending car thieves who are willing to steal cars in one state and transport them to another for disposition."); United States v. LaPorta, 46 F.3d at 154, 160 (2d Cir. 1994)(conviction for destroying government property upheld in case where FBI informant asked defendants to set fire to informant's "daughter's car," in reality a government-owned car, because "the defendants themselves 'committed the substantial

jurisdictional act' of burning the government [car]." (citations omitted).

There was no entrapment here. There was no pressure exerted on the defendant to carry through with the plan to have his wife murdered and his daughter kidnapped (or murdered). The government did not "cause" the crime to be committed. Rather, the defendant was simply given the opportunity–which he fully embraced-- to commit a crime that he was predisposed to commit. The Court properly rejected the defendant's request that the jury be instructed on entrapment.

WHEREFORE, the United States respectfully requests the Court to deny the defendant's motions for judgment notwithstanding the verdict and for a new trial.

    Respectfully submitted,

    MICHAEL J. SULLIVAN
    United States Attorney

By: /s/ Sandra S. Bower
    SANDRA S. BOWER
    RACHEL E. HERSHFANG
    Assistant U.S. Attorneys

Dated: 12-07-06

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

    /s/ Sandra S. Bower
    SANDRA S. BOWER
    Assistant U.S. Attorney