**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 05-10164-GAO |
| | ) | |
| GUILLERMO FREDERICO VASCO | ) | |

**UNITED STATES' SENTENCING MEMORANDUM**

The United States of America respectfully submits this sentencing memorandum. The government agrees with the calculation of the guidelines in the Presentence Report (PSR) which determined a Total Offense Level (TOL) of 39, Criminal History I, for a resulting range of 262 to 327 months. For reasons that will be discussed below, the government recommends that the defendant be sentenced to a term of 327 months.

**I. THE TOL IS PROPERLY COMPUTED AT 39.**

    **A**. **USSG §2A1.5 is the appropriate offense guideline.**

The defendant was convicted of five violations of 18 U.S.C. §1958. The statutory index of the United States Sentencing Guidelines (USSG) manual first directs one to §2E1.4 for a violation of this statute. Section 2E1.4 provides that the Base Offense Level (BOL) is the *greater* of either 32 or "the offense level applicable to the underlying conduct." (Emphasis added.) The commentary to §2E1.4 further explains that "[i]f the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used." When, as here, there is more than one potential BOL, "the determination of the applicable base offense level is treated in the same manner as a determination of a specific offense characteristic. Accordingly, the 'relevant conduct' criteria of §1B1.3 are to be used..." Application Note 2 to

1

USSG §1B1.2. Among other things, the relevant conduct provisions require the court to consider "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." In this case, as correctly found by the PSR, the underlying conduct is solicitation to commit murder, which is governed by USSG §2A1.5, providing a BOL of 33. This section further provides an increase of four levels if the offense "involved the offer or receipt of anything of pecuniary value for undertaking the murder." Although not required for a sentencing enhancement, the jury here necessarily concluded beyond a reasonable doubt that there was an offer or receipt of something of pecuniary value in this case and therefore, the four-level enhancement was properly scored, for an Adjusted Offense Level of 37.

The defendant asserts that application of the solicitation to commit murder guideline violates Apprendi[1] and the Supreme Court's Sixth Amendment jurisprudence in that it permits judicial fact finding to "drastically increase the guideline range by punishing him for a crime and criminal conduct that he was not convicted of." [Def. Mem. at 2]. However, Apprendi does not bar judicial determination of facts which increase a sentence as long as that sentence remains below the applicable statutory maximum. See Apprendi, 530 U.S. at 490; United States v. Perez-Ruiz, 353 F.3d 1, 15 (1st Cir. 2003) ("Apprendi does not prohibit a sentencing court from making factual findings that increase a defendant's sentence (including findings as to drug type and quantity) as long as the sentence imposed is within the default statutory maximum.") Nor does Cunningham v. California, 127 S.Ct. 856 (2007), cited by the defendant, compel a different result. In that case, the Supreme Court invalidated California's determinate sentencing law

---

[1]Apprendi v. New Jersey, 530 U.S. 466 (2000).

which permitted a judge to impose a sentence higher than the default middle term otherwise required by statute if the judge found one or more aggravating factors. Here, by contrast, the Court is not being asked to determine any fact which will increase the statutory maximum for the defendant's crimes,[2] but to make instead a fact-based determination as to which guideline governs the defendant's conduct. That this determination may subject the defendant to a harsher guidelines range, but one still within the statutory maximum, simply does not implicate the Sixth Amendment.

The guidelines are replete with examples of cross references which direct the use of another relevant guideline resulting in the greatest offense level. For example, most of the racketeering and criminal enterprises guidelines of USSG §2E include a cross reference requiring a comparison with the guideline most analogous to the underlying offense–or a guideline relating to loss amount– in order to select the guideline resulting in the highest offense level. Similarly, the statutory index for a violation of 21 U.S.C. §843(b), which prohibits the use of a communication facility in connection with a drug crime, or what is commonly known as a "telephone count," points to USSG §2D1.6 as the applicable guideline. Section 2D1.6, however, sets out no number at all for a base offense level but simply directs use of the offense level applicable to the underlying offense, which will typically be determined by drug weight under §2D1.1. Thus, a defendant who is convicted of using a telephone to facilitate a drug crime may properly be sentenced for the quantity of the drug involved, cabined only by the four-year statutory maximum for the offense of conviction. United States v. Citro, 938 F.2d 1431, 1444 (1st

---

[2] In his objections to the PSR the defendant contends that the statutory maximum for all five counts combined is 10 years. The government responds to this argument in section I. (C), *infra*.

Cir. 1991)(discussing the guideline amendment which eliminated the alternative base offense level of 12 and required consideration instead of the drug quantity involved in the offense). Although the defendant asserts that the BOL of 32 from §2E1.4(a) is the "presumptive 'statutory maximum,'" he cites no authority for this proposition and indeed, ignores the specific direction of that guideline to review the offense level for the underlying conduct and then to select the greater of the two.[3]

The defendant's reliance on United States v. Smith, 232 F.3d 650 (8th Cir. 2000) is misplaced as the sentencing judge in that case followed the same procedure for computing the appropriate guidelines range as found by the Probation Office and advocated by the government here. Thus, in Smith, the defendant was convicted of a violation of 18 U.S.C. §1958. In determining the guidelines range, the district court noted that §2E1.4 provided for a base offense

---

[3] As noted in the PSR, prior to the most recent amendment of §2A1.5, application of either that guideline or §2E1.4 resulted in the same guidelines range. [PSR at 37]. In an amendment effective November 1, 2004, however, the base offense level of §2A1.5 was increased from 28 to 33. The four-level enhancement if the offense involved the offer or receipt of anything of pecuniary value was retained. Notably, §2A2.1--Assault with Intent to Commit Murder; Attempted Murder–also was amended so that its base offense level of 28 was increased to 33. Like §2A1.5, the assault with intent to commit murder guideline also includes the four-level pecuniary value enhancement. These changes were part of an overhaul of all of the homicide related guidelines, which "were inadequate and in need of review," Supplement to Appendix C, Amendment 663, and seem to reflect a deliberate determination by the Sentencing Commission that the appropriate offense level for a defendant who solicits another to commit a murder, and offers to pay something of value for that effort, is level 37. As also noted by the PSR, when §2A1.5 was first added to the guidelines, §2E1.5 was amended "to conform the offense level" to that of the new guideline, thus indicating the commission's view that solicitation to commit murder involving the offer or receipt of something of pecuniary value is the same crime –and should be punished as such–as murder-for-hire. Perhaps it was an oversight by the Sentencing Commission to not increase the offense level of §2E1.4 to correspond with §2A1.5, or perhaps it was a recognition that amending §2E1.4 was unnecessary in that §2E1.4 already directs a comparison with the guideline relating to the underlying conduct and the use of the guideline which yields the greater offense level.

level of either 32 or the offense level of the underlying conduct, whichever is higher. The court determined that because a murder had been committed, the appropriate offense level was found in the guideline for first degree murder, USSG §2A1.1. See also, United States v. Levine, 188 F.Supp.2d 1089, 1093 (N.D. Ind. 2002)(first degree murder is underlying unlawful conduct for murder-for-hire when murder results, applying §2A1.1). Here, the court should determine that the defendant's underlying offense was the solicitation of the murder of his wife and child and that therefore, the greater offense level of §2A1.5 applies. The defendant appears to suggest that the solicitation guideline is only properly employed for a murder-for-hire conviction when the scheme is successful, and that this guideline covers "an offense not committed nor even legally or factually possible in this case." [Def. Mem. 3]. However, the guideline quite clearly applies to the defendant's conduct–hiring a person to commit murder. If the defendant's actions had resulted in the death of the victim, then the more serious first-degree murder guideline would provide the appropriate offense level.

### B. Count Five should not be grouped with Counts One through Four.

The Probation Office correctly determined that the sentencing guidelines preclude grouping Count Five, in which the defendant's daughter was identified as the victim, with Counts One through Four, in which the defendant's then-wife was the intended target. USSG §3D1.2 provides that "[a]ll counts involving substantially the same harm shall be grouped together into a single Group." This section goes on to explain that counts involve "substantially the same harm" within the rule when, among other things, the counts "involve the same victim." USSG §3D1.2(a) (emphasis added.) The Background section in the Application Notes provide further guidance, stating that:

> A primary consideration in this section is whether the offenses
> involve different victims. For example, a defendant may stab three
> prison guards in a single escape attempt. Some would argue that
> all counts arising out of a single transaction or occurrence should
> be grouped together even when there are distinct victims.
> Although such a proposal was considered, it was rejected because
> it probably would require departure in many cases in order to
> capture adequately the criminal behavior. Cases involving injury
> to distinct victims are sufficiently comparable, whether or not the
> injuries are inflicted in distinct transactions, so that each such
> count should be treated separately rather than grouped together.
> Counts involving different victims (or societal harms in the case of
> "victimless" crimes) are grouped together only as provided in
> subsection (c) [when one count reflects involves conduct treated as
> a specific offense characteristic, or adjustment, to the guideline
> applicable to another of the counts] or (d) [when offense level is
> determined based on loss, quantity of substance, or other measure
> of aggregate harm.]

See also United States v. Nedd, 262 F.3d 85, 92 (1st Cir. 2001) ("counts with distinct victims despite describing the same crime could not be grouped together.") The two Sixth Circuit cases cited by the defendant in support of his position–even if controlling in the First Circuit-- do not compel a different result because both of those cases involved a single victim. United States v. Wyn, 987 F.2d 354, 359 (6th Cir. 1993)(holding that separate phone calls relating to plan to murder one person constitutes only one violation of statute); United States v. Wilson, 920 F.2d 1290, 1294 (6th Cir. 1990)(separate phone calls charged as separate violations of 18 U.S.C. §1958 grouped under the guidelines if connected to a plan to murder the same person). Notably, the Sixth Circuit upheld a two-level upward departure in a murder-for- hire case involving multiple victims where the indictment did not charge separate counts for each victim. United States v. Pittman, 55 F.3d 1136, 1140 (6th Cir. 1995). In that case, the defendant was charged with solicitation to commit murder and with use of an interstate commerce facility in the commission of a murder-for-hire in connection with a scheme to have his niece and her 9-year-

old daughter killed. Both victims were named in the same counts, but the PSR set forth a hypothetical guidelines calculation as if the victims were named in separate counts. As here, the PSR concluded that under USSG §3D1.2(a), the counts relating to distinct victims would not be grouped and determined that the total offense level would have increased by two levels if the indictment had charged separate counts. Id. The district court departed upward and sentenced the defendant to 135 months, the high end of the hypothetical range. The Sixth Circuit affirmed, noting that "the sentence imposed did not exceed the term [the defendant] could have received had he planned the two murders separately." Id.

Similarly here, the defendant sought two murders, of two victims, and therefore, the Probation Office was correct to treat Count Five as a separate group from Counts One through Four. Application of the grouping rules results in a TOL of 39. [PSR ¶79].

**C. The defendant is subject to a total statutory maximum sentence of 50 years.**

Despite his conviction on five separate counts, each carrying a statutory maximum of 10 years' imprisonment, the defendant also contends that he may be sentenced to no more than 120 months. He asserts that because the counts all relate to one scheme, albeit a scheme to have two different people killed, that only one statutory maximum applies. As authority, he relies solely on the Sixth Circuit case of United States v. Wynn, 987 F.2d 354 (6th Cir. 1993). The government submits that Wynn is wrongly decided and contrary to relevant First Circuit precedent. In that case, the Sixth Circuit overturned the defendant's 130-month sentence on five counts of violating 18 U.S.C. § 1958 in connection with the proposed murder of his ex-wife. Relying on its prior decision in Wilson, which had held that charges relating to separate phone calls in furtherance of the same scheme to kill one person should be grouped, the Sixth Circuit

concluded that "separate phone calls which relate to one plan to murder one individual constitute only one violation of 18 U.S.C. §1958." Wynn, 987 F.2d at 359. Presumably then, even the Sixth Circuit would conclude that the defendant here is subject to at least 20 years' imprisonment because the defendant's scheme involved two victims.

The government submits that Wynn is wrongly decided. With no analysis, the Sixth Circuit equated the rationale under which the sentencing guidelines group offenses which involve substantially the same harm with the concept of the appropriate unit of prosecution. Thus, the grouping rules attempt to avoid multiple punishment for "substantially identical offense conduct," however charged, while at the same time providing "incremental punishment" for "significant additional criminal conduct." See Introductory Commentary to Chapter 3, Part D. Counts One through Four relating to the defendant's solicitation of the murder of his wife were grouped together and there was no sentencing enhancement merely because there was more than one use of the mail or telephone. But at the same time, these counts are four separate violations of 18 U.S.C. §1958–each of which carry 10-year statutory maximum--because the unit of prosecution is each phone call, or mailing, or other use of a facility of interstate commerce. See, e.g., United States v. King, 1997 WL 223057 *5 (N.D. Ill. 1997)(noting that defendant convicted of six counts of violating §1958 "could be sentenced up to 10 years in prison for each count.") Although it does not appear that the First Circuit has addressed this precise issue in connection with a violation of 18 U.S.C. §1958, it is well- settled in the mail fraud context that each mailing is a separate offense. See United States v. Serino, 835 F.2d 924, 930 (1st Cir. 1987)(each mailing in execution of the mail fraud scheme were "distinct and separate offenses."); United States v. Contenti, 735 F.2d 628, 631 (1st Cir. 1984)("Each separate use of

the mails in furtherance of the scheme constitutes a separate offense."); see also Cunningham, 127 S.Ct. at 876 (noting that a defendant convicted of 10 counts of mail fraud faced a potential sentence of up to 50 years, five years on each count)(Alito, J., dissenting).

The defendant is facing a total of up to fifty years' imprisonment and this Court may properly impose consecutive sentences on multiple counts of conviction in order to sentence him to 327 months. United States v. Saccoccia, 58 F.3d 754, 786 (1st Cir. 1995)("When...the maximum sentence for each offense of conviction is lower than the minimum punishment mandated by the applicable GSR, the guidelines require imposition of consecutive sentences 'to the extent necessary to produce a combined sentence equal to the total punishment.'")(citing USSG §5G1.2(d)); United States v. Garcia-Torres, 341 F.3d 61, 75 (1st Cir. 2003)("The Guidelines mandate the imposition of consecutive sentences in order to achieve (as close as possible) the 'total punishment.'"); see also United States v. Kapaev, 199 F.3d 596, 599 (2d Cir. 1999)(affirming imposition of consecutive sentences for conspiring to travel in interstate commerce with intent to commit a murder and for substantive crime of traveling with that intent in order to achieve total punishment called for by the guidelines.)

The defendant argues that he can be sentenced to no more than 120 months. If he is right, then no matter how many times a defendant used the telephone or mail to solicit a murder–10 times, 100 times, or 1,000 times– he/she could be sentenced to at most 10 years in prison if he was persistent only in relation to the elimination of a single victim. At the same time, in the defendant's view, no matter how many intended victims there are, a defendant could be sentenced to no more than 10 years in prison, as long as all of the victims were part of the same scheme. If he is correct, then the guidelines are woefully flawed because the initial, and

lowest, guidelines range for a BOL 32–which the defendant contends is the "presumptive" range–starts at 121 months, one month higher than presumably one could ever be sentenced to.

## II. THE DEFENDANT SHOULD NOT RECEIVE ANY REDUCTION FOR ACCEPTANCE OF RESPONSIBILITY.

The defendant also argues that he should receive a two-level reduction for acceptance of responsibility under USSG §3E1.1, because he "did not dispute his responsibility for the offense, but merely went to trial on the one count for which he maintained his innocence and to present his affirmative defense."  [Def. Mem. at 5-6].   That is simply wrong.  The defendant put the government to its proof at trial on all five counts, asserting he was entrapped into the scheme to murder his wife and maintaining his complete innocence with respect to the plan for his daughter.  Even now, the defendant continues to dispute his responsibility for the crimes for which he stands convicted and tells this Court –in his handwritten submission to the Probation Office entitled "The Government of United States deceived me and I fell" –that he was "used" and "duped" by Kevin Perry, who "overcame [his] reluctancy."]  [Def. Attachment to PSR at 2, 4].  The defendant continues to blame everyone else for the situation he finds himself in and is certainly not someone who "clearly demonstrates acceptance of responsibility for his offense."

As Application Note 2 to USSG §3E1.1 states, "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse."  The application note further states that a defendant does not automatically forfeit this reduction by going to trial, but cautions that the adjustment is limited to "rare situations" such as when the defendant goes to trial in order to raise issues unrelated to factual guilt, such as the constitutionality of the statute with which he is charged or the application of the statute to his

conduct.  Here, however, the defendant went to trial to challenge, if not his "factual" guilt, at the very least his legal responsibility for his conduct.  That is, he claims he was entrapped into committing the offense.  Notably, the defendant did not produce sufficient record evidence to support even a jury instruction on entrapment.   In similar factual situations, the First Circuit has consistently upheld a district court's refusal to grant a reduction for acceptance of responsibility.  See, e.g., United States v. Capelton, 350 F. 3d 231, 245 (1st Cir. 2003)(acceptance of responsibility reduction properly denied to defendant who was "caught on video and audio tape" selling cocaine to an undercover agent, but went to trial asserting what the district court described as a "weak" entrapment defense); United States v. Sanchez-Berrios, 424 F.3d 65, 79 (1st Cir. 2005)(reduction properly denied for defendant who had not met his threshold burden of showing improper inducement and who therefore was not entitled to an entrapment instruction).  As the court elaborated in Sanchez-Berrios, "[Defendant's] claim of entrapment was so weak that it did not even reach the jury.  Given his election to put the government to its proof at trial in order to explore so asthenic a defense, there is no principled way that we can set aside the trial court's discretionary refusal to discount his sentence for acceptance of responsibility."  Id. at 79; see also  United States v. Mikutowicz, 365 F. 3d 65, 75-78 (1st Cir. 2004)(defendant who admitted *actus reus* but challenged that he "willfully" violated the law not entitled to acceptance of responsibility reduction)(collecting cases); United States v. Crass, 50 F.3d 81, 84 (1st Cir. 1995)("intent, like any other essential element of the crime charged, may not be contested without jeopardizing a downward adjustment for acceptance of responsibility.")  It is of no

moment that the defendant offered to plead guilty to Counts One through Four,[4] as he still sought to preserve his right to challenge the district court's refusal to instruct on entrapment, an effort to continue to escape his responsibility for his crimes.   See  United States v. De Leon Ruiz, 47 F. 3d 452, 455-56 (1st Cir. 1995)(defendant who offered to plead guilty to drug charges but went to trial because government declined to drop firearms count–of which he was ultimately acquitted-- not entitled to acceptance of responsibility reduction.)   Moreover, the defendant challenged his factual guilt of Count Five at trial and maintains that position at sentencing.   The defendant is not entitled to a reduction for acceptance of responsibility.

### III. THE GOVERNMENT'S SENTENCING RECOMMENDATION

**A.  The defendant should be sentenced to 327 months' imprisonment.**

The government recommends that the Court sentence the defendant to 327 months' [27 years, 3 months] imprisonment, the high end of the applicable guidelines range.  As the Court is aware from presiding over the trial, the defendant was incarcerated in the Essex County Correctional Facility on charges pending in connection with a brutal attack on his estranged wife.  While in jail, he asked a fellow inmate for help in finding someone who could kill her and either kill or kidnap his 14-month old daughter.  The inmate contacted an ATF agent and, at ATF's direction, provided an address for the defendant to write to to contact the "hit man."  The defendant first sent a letter describing, in code, his plan to have his wife and daughter killed.  Thereafter, an undercover agent posing as the hit man met with the defendant in jail twice and talked with him on the telephone three times concerning this scheme.   Without restating all of

---

[4] An offer which came after the close of evidence and shortly before closing arguments were to begin.

the evidence here, the government submits that there are several aggravating factors warranting a sentence at the high end of the guidelines range. That is, the defendant sought to have his wife killed in order to eliminate the chief witness against him on the state charges for which he was being held. He conceived of and executed the scheme while incarcerated awaiting trial, a fact not taken into account by the guidelines as calculated but one mentioned specifically as a basis for an upward departure in USSG §4A1.3(D). One of the intended victims of the scheme was his 14-month old daughter and although the fact that there were two potential victims is taken into account in determining the sentencing range, it is worth noting the particular vulnerability of this victim in deciding where in the range the defendant should be sentenced. Finally, the government reminds the Court of the defendant's demeanor throughout the video-taped meetings and telephone conversations in which the scheme was detailed. These recordings do not display a defendant backed into a corner and latching onto a horrific plan out of some misguided sense of necessity and then, when the "deed" was done, expressing any kind of regret or remorse. Rather, the defendant expressed only regret that he could not accomplish the murder with his "own hands," or be there to have seen the act, and he smiled with glee when the hit man advised him that his wife learned she was about to die because she had crossed the defendant. He then promised his unwavering respect and friendship to the man who he believed had killed his wife and snatched his baby daughter from her mother's arms.

      Consideration of the factors enumerated in 18 U.S.C. §3553(a) also supports a sentence of 327 months here. A significant sentence reflects the seriousness of this offense in which the defendant endeavored to secure the murder of his wife and the murder or kidnapping of his daughter. Had the scheme played out as the defendant believed it was going to, Dr. Tricia Vasco

would be dead and their child, Claudia, would at best have been kidnapped and transported out of the country, or worse, she also would have been killed. Although the defendant contends that he should be sentenced leniently because his conduct was "aberrant," that claim is belied by the record. Dr. Vasco testified that the May 5, 2004, attack on her–in which the defendant bound her with duct tape, cut her with a knife, and threatened to burn the house down and kill all three of them–was indeed unusual, however, the defendant followed up this behavior in fairly short order with a detailed scheme to have his wife killed. He drew up diagrams of the house and identified where Dr. Vasco could be found and made suggestions as to when and how to best grab her to effect her murder. When given the opportunity to change his mind, he was adamant that the murder occur–giving the "proposal" the "green light." A significant sentence is necessary to provide just punishment for this heinous crime.

The defendant also argues that his "naivete" and "trusting nature" led to him being "taken in by Kevin Perry" and "allowed him to pursue this criminal act." [Def. Mem. 8]. Again, the videos and telephone conversations presented at trial do not support this conclusion. Instead, the evidence shows a clever, calculating man who, while enlisting the advice and expertise of his hired killer, was nonetheless the decision-maker in this scheme.[5] It was the defendant, not Perry, who decided–with input from the undercover agent–that Dr. Vasco's body should be stuffed into oil drum and dumped into the ocean. It was the defendant who drew the diagrams of his wife's house and described to the undercover agent how best to get in. And it was the defendant who questioned the hit man to make sure he had disposed of Dr. Vasco's cell phone

---

[5] It is also worth noting that the defendant is a highly educated man, holding several advanced degrees, including one in law. [PSR ¶112].

and clothes and the photos of her body, in other words, the evidence of the crimes he had hired the hit man to do.

A lengthy sentence also is necessary to provide adequate deterrence of criminal conduct, both specifically for the defendant who, one would hope, will not be able to prey again on his ex-wife or on his child, as well as generally for others who might commit this type of offense. The defendant asks the Court to consider a lesser sentence because the defendant will likely be deported to Ecuador once he finishes his term of imprisonment and he further seeks to serve a portion of his sentence in his native country. There is no mechanism of which the government is aware for the defendant to serve a United States sentence in a foreign country. In any event, as noted, one important aspect of sentencing is just punishment and the just punishment for the defendant's crimes here require a long term of incarceration regardless of whether he will be forced to leave the United States when it is finished.

**B.    If the Court determines the TOL to be less than 39, the government will seek an upward departure**.

If the Court rejects the application of USSG §2A1.5, the government submits that the resulting TOL would be no less than 34 (BOL of 32 increased by two levels pursuant to the grouping rules), for a resulting range of 151 to 188 months. If that is determined to be the applicable guidelines range, then the government advises defense counsel and the Court that it will seek an upward departure.

WHEREFORE, the United States respectfully requests that the Court sentence the defendant to a term of imprisonment of 327 months.

                Respectfully submitted,

                MICHAEL J. SULLIVAN
                United States Attorney

          By: /s/ Sandra S. Bower
                SANDRA S. BOWER
                RACHEL E. HERSHFANG
                Assistant U.S. Attorneys

Dated: 3-2-07

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants.

                /s/ Sandra S. Bower
                SANDRA S. BOWER
                Assistant U.S. Attorney