UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 05-10164-GAO

UNITED STATES OF AMERICA,

v.

GUILLERMO FREDERICO VASCO,
Defendant.

OPINION AND ORDER
September 20, 2018

O'TOOLE, D.J.

The petitioner, Guillermo Vasco, was convicted by a jury of five counts of using interstate commerce facilities in the commission of murder-for-hire of his wife and daughter. See 18 U.S.C. § 1958. He has moved to vacate his conviction and sentence pursuant to 28 U.S.C. § 2255.

I. **Factual Background**[1]

In late 2004, Vasco was in custody awaiting a state court trial for allegedly assaulting and raping his estranged wife, Tricia Vasco, in the presence of their young daughter, Claudia. Vasco solicited Kevin Perry, a fellow inmate, to help him find someone to kill Tricia. Vasco did not know that Perry had been cooperating with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") in various investigations. Perry contacted the ATF in March 2005 to report Vasco's solicitation, and the ATF initiated an undercover investigation using Perry. The Court of Appeals summarized:

---

[1] A full description of the facts is set forth in the appellate decision affirming Vasco's conviction. United States v. Vasco, 564 F.3d 12 (1st Cir. 2009). The Court recites only those facts necessary to resolve the issues raised in the pending motion.

Pursuant to the investigative plan, Perry was to give Vasco specific instructions for contacting Perry's friend "Mike," a hit man who was in reality ATF Special Agent Kenneth Croke. Vasco would write a letter to Mike, communicating the details of his request. Mike's address was a post office box in Portland, Maine.

Perry shared the instructions for contacting Mike with Vasco. Perry also made handwritten notes, based on his conversations with Vasco, containing detailed information about Tricia, including maps of the house where she lived. In these handwritten notes, under the heading "Questions," appears a reference to Claudia: "Can Claudia be saved, brought to Germany or other? (important) * (thru Canada)." The notes also disclosed that Vasco had established a code to use in discussing the murder. Tricia would be referred to as a dog named "Nickie," Claudia as Nickie's puppy "Candy," and the method of disappearance as "bring[ing] to vet." Perry mailed these notes to the ATF.

Several days later, Vasco wrote to Mike at the Portland post office box. In the letter, Vasco wrote:

> I've heard that our friends and their doggy Nickie will take a trip down there, Ah? That would be great if you could help them. But Nickie is very old and sick. She won't survive such trip ... the only thing would be to put Nickie to sleep ... I know ... Sad but true.... She was soo loyal and obidient. Anyways if so can she be buried outside of Mass ... ? Making sure that Nickie will be 10 feet down and do not forget the cement thing. Also I'd like to know if Candy would be able to see the family if not she must stay with Nickie down there.... I wish there is a better choice. Will be much more Nickie's ... I promes ya ... ok? In the other hand I'll send a the money collection that I mentioned. Remember that it's value more than five thousand dollars....

(Errors in original.) The letter was in Vasco's handwriting but bore as a return address Perry's name and inmate number at [the facility].

Vasco, 564 F.3d at 16.

Agent Croke retrieved the letter. Posing as Mike, Croke arranged to meet with Vasco. During that meeting, Vasco read aloud the letter and answered clarifying questions regarding the identity of "Nickie" and "the puppy." He and Croke discussed details about the kidnapping, the disposal of the bodies, and details of how Vasco would pay Mike for his services.

After the meeting, Vasco and Croke had three telephone conversations in calls initially placed by Perry. In one of the calls, they discussed whether Vasco was getting "cold feet." Croke

2

told Vasco that if "he did not want to go forward, that was 'fine by me . . . I haven't put any time or money into it. . . . [I]f, you know, you don't want to do it, it's, it's fine.'" Id. at 17. Vasco responded that he did want to proceed: "[Y]ou just go ahead, oh, absolutely go ahead and green light. . . . I need the stuff done." Id. Vasco subsequently made a partial payment to Croke.

Vasco was charged with five counts of use of interstate commerce facilities in the commission of murder-for-hire in violation of § 1958. The first and fifth counts were based on the letter Vasco mailed to Mike in April. The second, third, and fourth counts were based on his three telephone conversations with Croke, posing as Mike.

## II.    Procedural History

After a jury found Vasco guilty on all five counts, this Court sentenced Vasco to 120 months incarceration on the first four counts to run concurrently and 120 months on the fifth count to run consecutively to the term imposed on first four counts. Vasco timely appealed. On April 17, 2009, the Court of Appeals affirmed Vasco's convictions and sentence. Id. at 24. Vasco did not petition for a writ of certiorari.

In June 2015, Vasco, proceeding *pro se*, filed his § 2255 petition. The government filed a preliminary response to the petition requesting summary dismissal on the basis of untimeliness. The Court appointed counsel for Vasco. Counsel filed a supplemental motion to vacate to which the parties have filed an opposition and reply, respectively.

## III.   Discussion

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") establishes a one-year limitation period for habeas petitions filed by prisoners in federal custody. 28 U.S.C. § 2255(f). Generally, this period begins running from the date on which the judgment of conviction

3

becomes final.[2] Where, as here, the petitioner did not file a petition for certiorari with the Supreme Court, a "judgment of conviction becomes final when the time expires for filing a petition for certiorari." Clay v. United States, 537 U.S. 522, 525 (2003). A petition for certiorari must be filed within ninety days after the entry of judgment by the court of appeals. Sup. Ct. R. 13.1.

The Court of Appeals entered judgment affirming Vasco's conviction on April 17, 2009, and the conviction became final ninety days later, on July 16, 2009. The petitioner did not file his petition until almost six years later, well after the one-year deadline.

The petition, therefore, is untimely absent an applicable exception to the deadline or equitable tolling of it. Vasco advances arguments for both.

    A.    Exception Based on "Actual Innocence"

Vasco seeks to evade the limitations bar by invoking the "miscarriage of justice" exception based upon a claim of "actual innocence." He does not assert that he has discovered new factual evidence that tends to prove that someone else, and not he, committed the crimes, so that he is "factually innocent." See McQuiggin v. Perkins, 569 U.S. 383, 395 (2013). Nor does he argue that the evidence that supported his conviction no longer would do so because of an intervening Supreme Court decision refining the meaning of the relevant criminal statute. See Bousley v. United States, 523 U.S. 614, 620 (1998). As a matter of fact, nothing is really new, except that Vasco has fleshed out an argument he had apparently made in an abbreviated form on direct appeal:

> [W]e note that Vasco also argues, albeit in a fairly perfunctory manner, that the district court should have given another, slightly different entrapment instruction. Specifically, Vasco argues that even if the government did not entrap him in the classic sense, it did lure him into committing a federal crime by telling him to write and mail a letter. Vasco failed to request an instruction on this theory of defense which the government pegs as an allegation of "manufacture[d] jurisdiction."

---

[2] The other relevant trigging dates in § 2255(f) are inapplicable.

4

Vasco, 564 F.3d at 20.

The theory was first limned in Vasco's post-trial motion for a new trial. (Mot. for New Trial 2–3 (dkt. no. 64).) Because it had not been raised at trial, the Court of Appeals regarded it as procedurally defaulted and reviewed the claim for plain error. 564 F.3d at 20 ("[B]ecause the concept of manufactured jurisdiction is not well-developed in this circuit, and has been questioned in others, the district court's decision to not issue a manufactured jurisdiction sua sponte could not have been plain error.") That any claim of manufactured jurisdiction was forfeited and did not result in plain error is now the law of the case.

In any event, the claim that Vasco was actually innocent is meritless. He *did* send the letter in the mail and he *did* talk on the telephone in committing the crimes. Those are the facts. His manufactured jurisdiction argument, like his more conventional entrapment argument, is that the government improperly lured him into the use of interstate communication facilities and, by reason of that overreach, he should have the benefit of a version or analog of the entrapment doctrine. But there is no analytical difference between whether the government overreached on the jurisdictional element or overreached as to any other element of the offense. In either case, even if the defendant's actions establish each of the elements, he may nonetheless be entitled to acquittal because of the government's actions. The Supreme Court has said that "the miscarriage of justice exception is concerned with actual as compared to legal innocence." Sawyer v. Whitley, 505 U.S. 333, 339 (1992); see also Bousley, 523 U.S. at 623 ("It is important to note in this regard that 'actual innocence' means factual innocence, not mere legal insufficiency.").

Vasco relies largely on United States v. Archer, 486 F.2d 670 (2d Cir. 1973), an out-of-circuit, forty-five-year-old case generally recognized as creating the concept of manufactured jurisdiction. In that case, the Second Circuit reversed the defendant's convictions under 18 U.S.C.

5

§ 1952 where the evidence showed that a federal agent had crossed state lines to place a telephone call to one of the defendants "for the precise purpose of transforming a local bribery offense into a federal crime." 486 F.2d at 681.

The First Circuit has not embraced Archer's reasoning or outcome, and on at least two occasions, has emphasized the case's limited applicability. Indeed, on Vasco's direct appeal, the Court of Appeals noted that even the Second Circuit had more recently observed that "[c]ourts that have construed Archer have taken pains to limit its applicability, and to explain that 'manufactured jurisdiction' as an independent doctrine is a dubious concept." Vasco, 564 F.3d at 20 n.4 (quoting United States v. Wallace, 85 F.3d 1063, 1065 (2d Cir. 1996)).

More recently in United States v. Djokich, the First Circuit reviewed cases involving claims of manufactured jurisdiction and concluded that "[w]here the 'defendant freely participates in the jurisdictional act,' . . . courts routinely reject manufactured jurisdiction claims," 693 F.3d 37, 45 (1st Cir. 2012) (quoting United States v. Peters, 952 F.2d 960, 963 & n.6 (7th Cir. 1992)). It again noted that the Second Circuit "has explicitly recognized the doctrine's limited reach":

> Courts have refused to follow Archer when there is any link between the federal element and a voluntary, affirmative act of the defendant. Thus, when confronted with situations in which (i) the [government] introduces a federal element into a non-federal crime and (ii) the defendant then takes voluntary actions that implicate the federal element, this Court has consistently held that federal jurisdiction has not been improperly "manufactured" and that the statutory elements have been met, despite the surface similarity to Archer.

Id. (quoting Wallace, 85 F.3d at 1066).

In this case, government agents provided Vasco with the opportunity to commit a crime with a federal element, but Vasco readily seized that opportunity, taking the voluntary actions that included satisfying the federal jurisdictional element. See Djokich, 693 F.3d at 45; Wallace, 85 F.3d at 1066. While the government provided an address in Maine for Vasco to use to communicate with "Mike," Vasco willingly accepted the invitation to initiate contact with the would-be hitman

6

by mailing his letter to that address. And while Perry may have made the outgoing telephone calls to Croke, Vasco nevertheless voluntarily got on the telephone with Croke to discuss the murder plot. In sum, Vasco "freely participated in the jurisdictional acts" of using the interstate commerce facilities in the commission of murder-for-hire. See Djokich, 693 F.3d at 45 (quoting Peters, 952 F.2d at 963 & n.6); see also United States v. Mandel, 647 F.3d 710, 716–17 (7th Cir. 2011) (rejecting claim of manufactured jurisdiction where informant initiated some calls to defendant's cell phone, which the defendant either answered or returned, reasoning that the court had "been skeptical of the contention that the government 'manufactures' jurisdiction simply because its agent invites the defendant to take some action in or affecting interstate commerce and the defendant accepts that invitation").

Consequently, Vasco has not made a showing of actual innocence in the necessary sense and is therefore not entitled to the miscarriage of justice exception to the limitations period.

B. Equitable Tolling

In his original *pro se* motion, the petitioner contended that the circumstances of his case justified equitable tolling of the limitations period. A petitioner may be entitled to equitable tolling if he shows "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstances stood in his way and prevented timely filing." Dixon v. United States, 729 F. App'x 16, 19 (1st Cir. 2018) (quoting Holland v. Florida, 560 U.S. 631, 649 (2010)). "Put simply, the petitioner must satisfy the court that circumstances beyond his control prevented him from filing his motion within the one-year window provided by section 2255(f)." Id.

Vasco fails to demonstrate that circumstances beyond his control prevented him from timely filing. First, there is no evidence that he exercised reasonable diligence to pursue his rights in the almost six years it took him to file his § 2255 petition. Second, his proposed justifications

for failing to timely file—e.g., participation in drug and alcohol rehabilitation programs and pursuit of a civil case—represent circumstances common to many inmates, see, e.g., Holmes v. Spencer, 685 F.3d 51, 62–63 (1st Cir. 2012), or otherwise not beyond his control.

## IV. Conclusion

For the foregoing reasons, the government's motion for summary dismissal is GRANTED and the petition is DISMISSED as untimely.

Because Vasco has not shown that "jurists of reason would find it debatable whether the district court was correct in its procedural ruling," Slack v. McDaniel, 529 U.S. 473, 484 (2000), no certificate of appealability shall issue.

It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge